# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

VARUN CHOPRA, et al.,

        Plaintiffs,

v.                                    Case No. 16-13915

PHYSICIANS MEDICAL CENTER, LLC, et al.,

        Defendants.

_____/

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT AND DENYING BOTH PARTIES' MOTIONS FOR SUMMARY JUDGMENT

Before the court are Plaintiffs' motion for leave to file an amended complaint. (Dkt. # 77) and cross-motions for summary judgment. (Dkt. # 59, 61.) The court having reviewed full briefing on all three motions, concludes a hearing is unnecessary. *See* E.D. LR7.1(f)(2).  For the reasons discussed herein, the court will deny Plaintiffs' motion for leave to amend and deny both parties' motions for summary judgment.

## I. BACKGROUND

Plaintiff Varun Chopra graduated from American University of Antigua—a medical school in the Caribbean—in 2009, but sought to practice medicine in the United States. (Dkt. # 61-2, Pg. ID 13465.) To do so, he needed to be accepted into and complete a medical residency in either the United States or Canada. *See* American Medical Association, *Residency Program Requirements for International Medical Graduates*, available at https://www.ama-assn.org/life-career/residency-program-

[requirements-international-medical-graduates](requirements-international-medical-graduates). A medical residency program[1] screens recent medical school graduates to determine whether they are qualified to join the hospital's training program, which allows the graduates to treat patients under the supervision of certified, experienced physicians.

Plaintiff applied to residency programs throughout Canada and the United States for seven years—from 2009 until 2016. (Dkt. # 61-2, Pg. ID 1351.) Despite applying to residency programs in three different specialties—family medicine, psychiatry, and internal medicine—he received neither an interview nor an offer for any residency positions in the United States. (*Id.* at 1345, 1352.) He interviewed at seven residency programs in Canada, but similarly received no offers. (*Id.* at 1352.)

In 2016, a family friend introduced Plaintiff's father, Satish Chopra, to Parminder Minhas[2] whose son and daughter were both enrolled in the residency program at Defendant Physicians Medical Center, LLC, d/b/a Pontiac General Hospital ("the Hospital"), previously known as Oakland Physicians Medical Center. According to Varun Chopra, Minhas[3] "told there was an opportunity if we paid $400,000, I could-- because

---

[1] A medical institution wishing to operate a residency program must receive accreditation from the Accreditation Council for Graduate Medical Education, an organization that sets standards for "residency and fellowship programs and the institutions that sponsors them, and renders accreditation decisions based on compliance with these standards." See [http://www.acgme.org/What-We-Do/Overview](http://www.acgme.org/What-We-Do/Overview) (parenthetical omitted).

[2] Throughout the parties' depositions they fail to refer to referenced individuals by their full names upon first mention (and sometimes at all), leaving the court to search for this information, a practice the court is not obligated to undertake. *See Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("'Judges are not like pigs, hunting for truffles' that might be buried in the record.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)).

[3] Neither of the parties deposed Minhas although he seems central to the facts of the

he knew that I was in search of a residency position for several years, so he came to my father, you know, with this proposal." (Dkt. # 61-2, Pg. ID 1348.) According to Satish Chopra he met with Minhas who "said they [the Hospital] want $400,000. I said, are you out of your mind? $400,000 for the residency? Who sells the seats? This was news to me. I never knew this thing that the hospital sells the seats. It was news to me. I was really almost shocked. He said, no, you have to donate. I said, $400,000. It's demand money." (Dep. S. Chopra, Dkt. # 61-3, Pg. ID 1397.) Minhas had previously donated $250,000 to the Hospital. (Dkt. # 61-3, Pg. ID 1405.)

Minhas allegedly arranged for Plaintiffs' parents, Satish and Poonam Chopra, also party to this case, to meet Defendant Hospital's representatives, Defendants' Sanyam and Priyam Sharma. Varun Chopra and his parents visited the Hospital, which was either in bankruptcy or had recently come out of bankruptcy at the time. (Dkt. # 61-3, Pg. ID 1400; Dkt. # 52-2, Pg. ID 1040.) The parties dispute the details of the numerous communications and meetings that occurred next, but undisputedly, Plaintiffs' Satish and Poonam Chopra paid $400,000 to Defendant Hospital by two checks. The next day Plaintiff Varun Chopra and Defendant Hospital's representative, Defendant Sanyam Sharma, signed a residency agreement ("the Agreement"), thereby accepting Plaintiff to the Hospital's residency team, and permitting him to treat patients here in Michigan.

A residency agreement is a standard contract the Hospital uses for each of its

_____

case. The record indicates some trouble in obtaining a statement from Minhas, who apparently resides in Canada. Various depositions in the record refer to a sworn affidavit of Minhas, but this alleged affidavit has not been entered into the record as far as the court can tell. (*See* Dkt. # 61-3, Pg. ID 1402.)

residents. (Dep. N. Hemady, Dkt. # 61-7, Pg. ID 1546.) The Agreement details the terms of the residency including the resident's duties to patients and the compensation owed by the Hospital to the resident. (Dkt. # 1-3, Pg. ID 13-16.) The Agreement also includes a termination provision allowing the Hospital to terminate or not renew the Agreement at its discretion if it finds that the resident has failed to fulfil his/her obligations under the Agreement. (*Id.*) Plaintiffs allege that Defendants indicated that Chopra needed a signed residency agreement "in order to participate in the residency program at the Hospital." (Dkt. # 1, Pg. ID 3.) Plaintiffs allege that Defendants "would not sign the Residency Agreement unless and until the Hospital was paid $400,000." (Dkt. # 1, Pg. ID 3.) There is no mention of the $400,000 payment or any required payment to the Hospital in the Residency Agreement.

Following the $400,000 payment, Plaintiff Varun was contacted by the Hospital's Family Medicine Residency Program Administrator, Carol Samson, congratulating him on his admission to the Hospital's residency program. Plaintiff, however, had not yet submitted an application to the residency program. (Dkt. # 61-2, Pg. ID 1346.) In fact, Samson had not yet opened a file for Plaintiff when the Program Director, Dr. Nick Hemady, informed her that Plaintiff had been accepted and would be coming in to meet with her. (Dep. C. Samson, Dkt. # 52-4, Pg. ID 1100.)

Plaintiff sent his Canadian residency application to Samson and she allegedly indicated it would not be sufficient and he would need to apply through the national system. (Dkt. # 61-2, Pg. ID 1346.) Plaintiff then logged onto the national Electronic Residency Application Service ("ERAS") to apply to Pontiac General Hospital's

program. He no longer possessed his most recent letters of recommendation so he included his letters from his medical school professors, written seven years earlier, instead. Samson allegedly "said those will work. We just need to fill out your file." *Id.*

Following this transaction, both the Hospital and Varun Chopra began to make arrangements for Chopra to begin his formal training on November 1, 2016. For example, the Hospital assisted Chopra in applying for his J-1 non-immigrant visa, which was legally required before he could begin the residency program. Additionally, Samson enrolled Chopra in the Hospital's online intranet to allow him to access residency documents. (Dkt. # 59 Pg. ID 1266.)

On September 28, 2016, Chopra and the Hospital signed a second contract to allow Chopra to begin the Hospital's Observership Program. (Dkt. # 1, Pg. ID 3.) The Observership Program "expose[s] the Observer to the provision of patient medical care with the understanding that such program will enable the Observer to assume the duties of a Resident. . . ." (Dkt. # 1-4, Pg. ID 17.) Defendants argue that participation in the Oberserversship Program is a part of the residency program. (Dkt. # 59, Pg. ID 1271-73.) According to Defendants the Observership Program is made available when a resident's "legally required medical licensure and non-immigrant visa" are pending and as a result s/he cannot participate in the residency program activities, as was the case with Chopra. (Dkt. # 59, Pg. ID 1265.) (Dep. S. Sharma Dkt. # 61-5, Pg. ID 1470.) Chopra participated in the Observership Program from October 3, 2016 through October 26, 2016.  (Dkt. #1, Pg. ID 3.)

On October 26, 2016, Chopra became disassociated from the residency

program; the parties dispute how and why. Plaintiffs assert that Defendant Priyam Sharma notified Plaintiff Poonam Chopra by telephone that Varun Chopra was summarily dismissed from the residency program. (Dkt. # 1 Pg. ID 4.) Poonam Chopra testified that Priyam told her that she and the Medical Director of the Residency Program Dr. Nikil Hemady had a meeting and "decided Varun is not joining the program." (Dep. P. Chopra, Dkt. # 61-4, Pg. ID 1440.)

In contrast, Defendants argue that Priyam Sharma telephoned Plaintiff Poonam Chopra regarding Varun Chopra's disengagement from the program. Specifically, Priyam Sharma could not testify to whether Varun Chopra withdrew from the program or the Hospital terminated him from the program. She only remembered that she called Poonam Chopra to discuss Varun Chopra "ending the program" and "that there was a disengagement between Varun and the hospital. By whose side, who did what, I did not know."[4] (Dep. P. Sharma, Dkt. # 61-6, Pg. ID 1511, 1514.) In any event, Poonam Chopra then telephoned her son regarding his participation in the program.

On October 28, 2016, Varun Chopra emailed Dr. Hemady stating in part, "It was very disappointing to hear that I will not be starting my post graduate training at Pontiac general hospital. Unfortunately, I have only been told through second hand sources that I will not be starting the program." (Dkt. # 1-6.) Defendant Sanyam Sharma sent a letter to Varun Chopra on November 1, 2016 stating, "The purpose of this letter is to confirm

---

[4] A lack of memory is common theme among the depositions of the Sharmas. Satish Sharma testified that he knows Parminder Minhas, but does not recall how many times he spoke or met with him during the relevant time period, "I would not say I talked to him two times or two hundred times. It was somewhere in between of that." (Dkt. # 52-2, Pg. ID 1058.) He also had a hard time remembering whether Minhas was present at any of his meetings with any of the Chopras. (Dkt. # 52-2, Pg. ID 1042.)

that you no longer have a relationship with Pontiac General Hospital due to your withdrawal from the residency program effective November 1, 2016." (Dkt. # 1-5, Pg. ID 19.) Varun Chopra returned to Canada on November 2, 2016. Thereafter, Plaintiffs Satish and Poonam Chopra attempted to secure a refund of their $400,000, but Defendants refused to return it asserting it was a voluntary donation.

## A. Procedural History

In light of these events, Plaintiffs filed this action against Defendants and alleged claims for breach of contract, fraud in the inducement, and civil conspiracy. Plaintiffs requested leave to amend their complaint to add claims of conversion. (Dkt. # 25.) The court denied Plaintiffs' amendment as futile and also granted Defendants' Motion to Dismiss Plaintiffs' fraud and civil conspiracy claims, (Dkt. # 57), leaving only Plaintiffs' breach of contract claim. (Dkt. # 57.)  Due to egregious discovery violations by Defendants, this court further ordered pursuant to Fed. R. Civ. P. 37(b)(2)(A)(i), "that the Donated Funds in the amount of $400,000 were in fact an entry fee, and a mandatory component of the terms of the Residency Agreement, operating as a condition precedent to Plaintiff Varun Chopra's entry into Defendants' Residency Program." (*Id.* at 1247.) Both parties filed motions for summary judgment. (Dkt. # 59, 61.)

Prior to the hearing on the parties' cross-motions for summary judgment, the court issued an order directing the parties to be prepared to address certain legal issues that the court found to be particularly unclear in the briefing and in need of elaboration. Specifically, the following subjects were included in the court's order:

> (1) whether Plaintiffs' claim for breach of contract includes allegations of an implied in fact contract or an implied in law contract which survive

7

Defendants' motion;

(2) whether Plaintiffs' complaint includes allegations that Varun Chopra was a third-party beneficiary to any such contract; and

(3) whether Plaintiffs assert any claim based on agency.

(Dkt. # 75.) At request of the parties, the court converted the motion hearing to a status conference, prior to which Plaintiffs filed a motion for leave to file "Amended Complaint to Conform to Evidence Established During Discovery" and attached a proposed amended complaint. (Dkt. # 77.) Defendants filed a response opposing the motion (Dkt. # 82), and Plaintiffs filed a reply. (Dkt. # 83.) The court will now address each of the three pending motions.

## II. STANDARD

### A. Leave to Amend

According to Federal Rule of Civil Procedure 15(a)(2), after the time allotted under Rule 15(a)(1) has expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Although the rule embodies a liberal amendment policy, leave to amend may be appropriately denied "when there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Brown v. Chapman*, 814 F.3d 436, 443 (6th Cir. 2016) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

### B. Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F. 3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F. 3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F. 3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F. 3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

### III. DISCUSSION

The present case is before the court under its diversity jurisdiction. Plaintiffs are legal residents of Canada. Defendants are a Michigan limited liability company with its

principal place of business in Pontiac, Michigan, and the Sharmas,[5] allegedly the majority owners of Defendant Hospital with Priyam Sharma serving as the Chief Executive Officer and Sanyam Sharma serving as the President.  As such, the court will apply Michigan law with respect to its review of Plaintiffs' breach of contract claim and Plaintiffs' proposed amendments to said claim.

## A. Michigan Contract Law

In Michigan, "[a] party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). "A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 830 (Mich. 2016). "[T]he damages recoverable for breach of contract are those that arise naturally from the breach or those that were in the contemplation of the parties at the time the contract was made." *Kewin v. Massachusetts Mut. Life Ins. Co.*, 295 N.W.2d 50, 52–53 (Mich. 1980); *see also Lawrence v. Will Darrah & Assocs., Inc.*, 516 N.W.2d 43, 48 (Mich. 1994). There are four principles of Michigan contract law that are particularly relevant to Plaintiffs' claim—implied contract, liability to third-parties, agency, and damages.

## 1. Implied Contracts

A contract may be express or implied. "There are two kinds of implied contracts;

---

[5] Whether Satish Sharma is Priyam Sharma's son or husband is unclear.

one implied in fact and the other implied in law. The first does not exist, unless the minds of the parties meet, by reason of words or conduct. The second is quasi or constructive, and does not require a meeting of minds, but is imposed by fiction of law, to enable justice to be accomplished, even in [a] case [where] no contract was intended." *Cascaden v. Magryta*, 225 N.W. 511, 512 (Mich. 1929); see also *City of Detroit v. City of Highland Park*, 39 N.W.2d 325, 334 (Mich. 1949) (noting that implied in law contracts are also known as constructive or quasi contracts).

"Contracts implied in law are not true contracts, but instead are quasi-contracts implied by courts *when a party retains money* or benefits which in justice and equity belong to another." *PNC Bank, Nat. Ass'n v. Goyette Mech. Co.*, 88 F. Supp. 3d 775, 784 (E.D. Mich. 2015) (emphasis added) (applying Michigan law) (internal quotation and citation omitted). "'The essential elements of a quasi contractual obligation [one implied in law], upon which a recovery may be had, are the receipt of a benefit by a defendant from a plaintiff, which benefit it is inequitable that the defendant retain.'" *Moll v. Wayne Cty.*, 278–79, 50 N.W.2d 881, 883 (Mich. 1952) (quoting *Herrmann v. Gleason*, 126 F.2d 936, 940 (6th Cir. 1942) (overruled in part on other grounds by *Brown v. State, Dep't of Military Affairs*, 191 N.W.2d 347, 351 (Mich. 1971)). A finding of an implied contract in law is a remedy "under the equitable doctrine of unjust enrichment . . . with an implied obligation to pay for benefits received to ensure that exact justice is obtained." *Michigan Educ. Employees Mut. Ins. Co. v. Morris*, 596 N.W.2d 142, 151 (Mich. 1999) (internal citations and quotations omitted.) "Restitution may be imposed under the equitable theory of implied contract or quasi-contract to prevent the unjust

enrichment of one party at the expense of another." *Hofmann v. Auto Club Ins. Ass'n*, 413 N.W.2d 455, 457 (Mich. App. 1987) (citing 66 Am Jur 2d, Restitution & Implied Contracts, §§ 1-3, pp 942-946).

A contract implied in fact "is to be gathered by implication or proper deduction from the conduct of the parties, language used, or things done by them, or other pertinent circumstances attending the transaction." *Tustin Elevator & Lumber Co. v. Ryno*, 129 N.W.2d 409, 414 (Mich. 1964) (quoting *Miller v. Stevens*, 195 N.W. 481, 482 (Mich. 1923). "Courts recognize implied contracts where parties assume obligations by their conduct." *Williams v. Unit Handling Sys. Div. of Litton Sys., Inc.*, 449 N.W.2d 669, 670 (Mich. 1989). The court reviews "all the facts and circumstances to evaluate the intent of the parties" in determining whether a reasonable juror could find a contract implied in fact. *Rowe v. Montgomery Ward & Co.*, 473 N.W.2d 268, 273 (Mich. 1991).

### 2. Liability to Third-Parties

Generally, "the only liability [a contracting party] has to an injured third-party [i.e., a non-contracting party] is with respect to negligent performance of his or her contractual duty." *Williams v. Polgar*, 215 N.W.2d 149, 156-157 (Mich. 1974) (explaining that "[s]ince the legal duty which, when breached, gives rise to a tort cause of action, springs from the contractual duty imposed" the contracting party has a limited legal obligation to non-contracting parties). Absent a tort cause of action for the negligent performance of a contractual duty, a litigant must have been party to the contract to claim economic damages for an alleged breach of a contract. *See Downriver Internists v. Harris Corp.*, 929 F. 2d 1147, 1149 (6th Cir. 1991) (applying Michigan law). However,

by statute Michigan has created another basis for a breach of contract action by a third-party.

An intended third-party beneficiary may bring a claim when a contractual promise in their favor has been breached. *See Thornberry v. Grand Trunk W. R.R. Inc.*, 776 F. Supp. 2d 453, 459 (E.D. Mich. 2011) (applying Michigan law). In relevant part, Mich. Comp. Laws § 600.1405 states,

> Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

"Importantly, the plain language of this statute reflects that not every person incidentally benefitted by a contractual promise has a right to sue for breach of that promise, but rather only if the promisor has 'undertaken to give or to do or refrain from doing something *directly* to or for said person.'" *Brunsell v. City of Zeeland*, 651 N.W.2d 388, 390 (Mich. 2002) (citing MCL § 600.1405(1)) (emphasis in original). "By using the modifier 'directly,' the Legislature intended to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract." *Schmalfeldt v. N. Pointe Ins. Co.*, 670 N.W.2d 651, 654 (Mich. 2003) (internal apostrophes added).

### 3. Agency

"The term "agency" includes every relation in which one person acts for or

represents another by his or her authority." 1 Mich. Civ. Jur. Agency § 4. "An agency relationship may arise when there is a manifestation by the principal that the agent may act on his account." *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. App. 1992). An agent may be "authorized to conduct a single transaction or a series of transactions not involving continuity of service" and may also "bind a principal by contracts or conveyances that he is authorized to make." *People v. Konrad*, 536 N.W.2d 517, 522 n 7 (Mich. 1995) (internal citation and quotations omitted). "[F]undamental to the existence of an agency relationship is the right to control the conduct of the agent, with respect to the matters entrusted to him." *St. Clair Intermediate Sch. Dist.t v. Intermediate Educ. Ass'n/Michigan Educ. Ass'n*, 581 N.W.2d 707, 716 (Mich. 1998) (internal citation omitted); *see also Goldman v. Cohen*, 365 N.W.2d 754, 756 (Mich. 1985) ("It is a requisite of an agency relationship that the principal has the right to control the conduct of the agent with respect to matters entrusted to him.") (internal quotation and citation omitted).

An agency may exist even absent an express declaration. "An implied agency must be an agency in fact; found to be so by reasonable deductions, drawn from disclosed facts or circumstances. While it cannot exist contrary to the express will of an alleged principal, it may spring from acts and circumstances within his control and permitted over a course of time by acquiescence or in recognition thereof." *Weller v. Speet*, 267 N.W. 758, 758 (Mich. 1936). The existence of an agency may be deduced from the course of the parties' dealings. *See L.A. Walden & Co. v. Consol. Underwriters*, 25 N.W.2d 248, 249 (Mich.1946).

The existence and scope of an agent's authority "may be either actual or apparent." *Alar v. Mercy Mem'l Hosp.*, 529 N.W.2d 318, 323 (Mich. App. 1995) (citing *Meretta v. Peach*, 491 N.W.2d 278 (1992). "Apparent authority arises where the acts and appearances lead a third person reasonably to believe that an agency relationship exists. However, apparent authority must be traceable to the principal and cannot be established only by the acts and conduct of the agent." *Id.* "The existence and extent of an agency may be inferred from attending facts and circumstances, and if there be in proof facts from which an agent's authority can be fairly and reasonably inferred, the question becomes one for a jury." *Douglas v. Ins. Co. of N. Am.*, 184 N.W. 539, 541 (Mich. 1921).

### B. Plaintiffs' Motion for Leave to File Amended Complaint

Plaintiffs propose to amend their complaint to further develop arguments and add legal support to advance their breach of contract claim. They seek to add legal citations related to specific types of breach of contract, namely implied breach, breach to a third-party beneficiary, and a theory of breach dependent on a finding of agency. (Dkt. # 77-1.) Plaintiffs' motion comes four months after the close of discovery and three months after the dispositive motion deadline. Their request for leave to amend follows a previously failed motion for leave to amend and full briefing on cross-motions for summary judgment. The court agrees with Defendants that Plaintiffs have not adequately explained their failure to seek leave to amend sooner or otherwise shown good cause. To the extent Plaintiffs' motion seeks to add "new causes of action" (Dkt. # 77, Pg. ID 1848), it will be denied as unfairly prejudicial to Defendants.

15

Plaintiffs argue in part that their delay is due to Defendants' obstreperous conduct during discovery—conduct that prompted a motion to compel and eventually resulted in multiple court ordered sanctions against Defendants. (Dkt. # 83, Pg. ID 1927.) The difficult discovery process may have hindered Plaintiffs ability to develop their claims more thoroughly, but three months passed after the resolution of those discovery issues prior to Plaintiffs' motion to amend and Plaintiffs have not explained their continued delay.

Plaintiffs next argue that the tardiness of their motion should be excused because the court's June 15, 2017, opinion and order awarding sanctions against Defendants changed the legal landscape of the case in a manner that caused Plaintiffs to believe further clarification of their breach of contract claim was unnecessary. (Dkt. # 77-2, Pg. ID 1858.) Plaintiffs argue that it was not until the court's October 6, 2017 order directing the parties to prepare for the summary judgment motion hearing that they determined they should file an amended complaint. *Id.*

Plaintiffs misunderstand the court's October 6, 2017 order and in doing so, fail to recall the reason courts hold motion hearings. A motion hearing is "intended to aid th[e] Court in its decision." *See Mohamed v. United States*, No. 1:13-CV-335, 2013 WL 4499230, at *4 (W.D. Mich. Aug. 20, 2013). A hearing provides the court with an opportunity to question the parties regarding propositions advanced in their briefs in an effort to better understand points of confusion or disagreement.

Thus, here, the court directed the parties to the issues in need of further clarification in advance of the motion hearing to ensure the hearing would be a

productive use of the parties' and the court's time. By highlighting the issues in the complaint and briefing that the court viewed as central to resolving the parties' motions, the order provided counsel for both parties an opportunity to address the contours of Plaintiffs' breach of contract claim at the hearing.

Court guidance was particularly appropriate here given the parties' summary judgment briefs, which at times seemed to talk past one another. For example, Defendants' Motion for Summary Judgment argues that Plaintiffs cannot succeed under a third-party beneficiary theory because Mr. and Mrs. Chopra were not intended beneficiaries of Plaintiff Varun Chopra's contract with the Hospital. (Dkt. # 59, Pg. ID 1269.) However, Plaintiffs' argument, as the court understands it, asserts that Varun Chopra was the beneficiary of his parents' implied contract with the Hospital. (*See* Dkt. # 65, Pg. ID 1629 (asserting that the Chopras paid $400,000 "to gain Dr. Chopra's admittance to the Residency Program" and Dr. Chopra's mother and father discussed their "joint objective," Dr. Chopra's admittance into the Residency Program, with the Hospital).) Yet, in response to Defendants' argument, Plaintiffs seem to be advancing both arguments. *See* Dkt. # 65, Pg. ID 1629 (asserting that the Hospital's promise was made to benefit *both* Dr. Chopra and his parents).

Plaintiffs now address these issues in their proposed amended complaint, but these are the precise points of clarification Plaintiffs could have addressed at the motion hearing. Instead they mistook the court's pre-hearing order as a direction to seek amendment and unnecessarily abandoned their assessment that an amendment to their complaint was not necessary. (*Id.* at 1629 (stating that Plaintiffs "do not believe [an

amendment] is necessary" to clarify their third-party beneficiary claim)). Indeed the court agrees Plaintiffs' proposed amendment is only "a clear statement of Plaintiffs' legal theories" and "simply states [Plaintiffs'] theories clearly." (Dkt. # 83, Pg. ID 1928.) The court further agrees with Plaintiff that "the amendment sought here flows directly from the facts established during discovery" and that Defendants have been on notice of these claims from the inception of this litigation. (Dkt. # 77, Pg. ID 1848.)

While it is true that further legal argument and support would have produced a more articulate complaint and could have aided the court's analysis of Plaintiffs' breach of contract claim, it does not follow that Plaintiffs have not adequately pled their claim and must now seek leave to amend at the eleventh hour. A claim for relief need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Tellingly, Defendants never filed a motion to dismiss Plaintiffs' breach of contract claim.

Now the court will analyze whether Plaintiffs have met the higher bar imposed on the movant under the summary judgment standard to demonstrate that the evidence presents no genuine issue of material fact as to their right to recovery or, alternatively as Defendants assert, no question that Plaintiffs' claim is meritless.

### C. Plaintiffs' Motion for Summary Judgment

In support of Plaintiffs' motion, Plaintiffs argue there is no genuine dispute of material fact regarding the breach of the Residency Agreement—the Hospital did not

permit Varun Chopra to begin the residency program and Chopra did not withdraw from it. Defendants' response is two-fold. First, Defendants argue that there is no genuine dispute regarding Varun Chopra's entry into the residency program—the evidence shows he entered the program prior to October 26, 2016. Thus, the Hospital's obligation with respect to the $400,000 was fulfilled. Second, Defendants argue that even assuming Varun Chopra never entered the Residency Program, summary judgment to Plaintiff is inappropriate because the reason for Chopra's failure to join the program is in dispute. Defendants argue there is evidence showing that his failure to join the program was to no fault of the Hospital; he withdrew voluntarily.

The Agreement states in relevant part:

I. Appointment

Hospital offers and Resident accepts appointment as a first year resident in Family Medicine for the year beginning [November 1, 2016] and ending [October 31, 2017].[6]

II. Hospital's Obligations

Hospital agrees to provide a training program that meets the standards established in the essentials of approved residencies, as formulated by the Accreditation Council on Graduate Medical Education of the American Medical Association.

(Dkt. # 1-3, Pg. ID 13.) Further this court issued a sanction against Defendants finding that,

"the 'donated' funds were in fact a mandatory component of the terms of the residency agreement, and a condition precedent to Plaintiff Chopra's entry in to the residency notwithstanding the written agreement's integration clause."

---

[6] Undisputedly, the parties modified the original dates in the contract to reflect those shown in brackets above.

(Dkt. # 57, Pg. ID 1245-46.)

The court begins its review with Plaintiffs' initial assertion—that there is no genuine dispute regarding whether Chopra entered the residency program because he did not. The contract specified that Chopra's "appointment as a first year resident" began on November 1, 2016 and undisputedly, Chopra's relationship with the hospital discontinued prior to that date. (Dkt. #1-3.) Additionally, Defendant Priyam Sharma testified that the residency program did not begin until November 1, 2016 and that Chopra was not in the residency program prior to that date. (Dkt. #61-6, Pg. ID pg 1512.) However, the contract language is not dispositive of whether Chopra, in fact, entered the program prior to November 1, 2016 and Defendants point to evidence contrary to Defendant Priyam Sharma's testimony.

Defendants argue that Chopra entered the program as soon as the agreement was signed because Defendant Sanyam Sharma testified that he "accept[s] the residents by executing the residency agreement[s]." (Dkt. #61-5, Pg. ID 1463.) As additional proof of Chopra's entry into the program, Defendants cite Chopra's access to the online resident system, the assistance the Hospital's provided him in obtaining a visa, and his participation in the Hospital's Observership Program. Whether these actions constituted "entry" into the Residency Program is a factual question for the jury. Reasonable minds could differ, as the parties have, regarding whether Chopra entered the residency program. The court concludes that Defendants have presented a genuine issue of material fact and summary judgment is not proper for that reason.

Additionally, the same reasonable minds could differ on whether Varun Chopra

20

withdrew from the program or was terminated. As explained *supra* Section I, Poonam Chopra and Priyam Sharma provided different accounts of their phone conversation regarding Varun Chopra's dissociation from the Hospital. Likewise, Varun Chopra's email to Dr. Hemady and Sanyam Sharma's letter to Varun Chopra characterize the events differently. This conflicting evidence presents a question of material fact, the resolution of which rests on credibility determinations properly left to a jury.

## D. Defendants' Motion for Summary Judgment

In claiming entitlement to summary judgment, Defendants make four arguments. First, Plaintiffs Satish and Poonam Chopra do not have standing to sue for breach of contract because they did not sign the Residency Agreement and are not parties to the contract. Second, Plaintiff Varun Chopra cannot claim the $400,000 paid by his parents as damages and he has no other damages or injuries. Therefore, he also has failed to establish standing to bring suit. Third, Defendants fulfilled their obligations under the contract because Chopra entered the residency program. Fourth, Defendants argue that even if Plaintiffs were correct that Chopra never entered the program and he did not withdraw, Plaintiffs' claim still fails as a matter of law because the Hospital had the right under the terms of the Residency Agreement to terminate Chopra from the program. Therefore, there was no breach of the Agreement as a matter of law even under the version of the facts most favorable to Plaintiffs. In evaluating these claims, the court reviews the facts in the light most favorable to the Plaintiffs.

### 1. Plaintiffs Satish and Poonam Chopras' standing

Defendants correctly state that Plaintiffs Satish and Poonam Chopra never

signed the Residency Agreement and thus were not a written party to the contract; however, that fact does not settle the matter. Under Michigan law, a party may be liable to another for breach of contract even when one is not a written party to an express contract.[7] For instance, Plaintiffs emphasize that the Chopras provided to the Hospital the $400,000, which this court held was "a mandatory component of the terms of the Residency Agreement." (Dkt # 57.) As Plaintiffs allege Satish and Poonam Chopra paid this amount for the purpose of obtaining their son's entry into the Hospital's residency program and the court has determined that it was for that purpose, Plaintiffs raise a genuine question of fact as to whether the Hospital had an agreement with the Chopra family.

Several additional "facts and circumstances" could lead "a reasonable juror" to conclude that there was an implied in fact contractual relationship between the Chopras and the Hospital with Varun Chopra as the intended beneficiary. *See Rowe*, 473 N.W.2d at 273. The Chopras attended the meeting at which Varun Chopra and the Hospital signed the agreement and they were active participants in the contracting process.  As Defendants' state in their Motion for Summary Judgment, "Dr. Chopra *and* his mother, Mrs. Poonam Chopra negotiated freely the Residency Agreement."  (Dkt. #59, Pg. ID 1264) (emphasis added). In order to terminate the contractual relationship among the parties, Plaintiffs allege that Defendant Priyam Sharma telephoned Poonam

---

[7] Plaintiffs make a passing argument that the Chopras could have been intended beneficiaries of the written contract between Plaintiff Varun Chopra and Defendants. The court need not address the merit of this argument because the court has found a genuine issue of material fact exists as to whether the Chopras were a party to the contract based on other grounds.

Chopra rather than Varun Chopra, and told her to "tell [Varun] to come home." (Dep. P. Chopra, Dkt. #61-4, Pg. ID 1440.) Defendants at minimum agree that Defendant Priyam Sharma called Poonam Chopra rather than Varun Chopra to discuss his disassociation from the program. (Dep. P. Sharma, Dkt. # 61-6, Pg. ID 1511, 1514.)

Defendants have failed their initial burden to show the absence of evidence regarding the existence of an implied contract between the Chopras and the Hospital. If an implied contract existed, Satish and Poonam Chopra would have standing to sue the Hospital. The court agrees with Plaintiffs that the evidence in the record presents a genuine issue of fact as to whether a reasonable juror could make a "proper deduction from the conduct of the parties" that an implied in fact contract existed. *Tustin Elevator & Lumber Co.*, 129 N.W.2d at 414.

## 2. Damages

Defendants argue that since Varun Chopra's parents paid the $400,000 to Defendants, he cannot claim those monies as damages. But this assertion proves to be too simple. If the jury found an implied contract between the Chopras and the Hospital, as discussed *supra* Section II (A)(1), and Varun Chopra was found to be an intended beneficiary of that contract, he would have a basis to claim the $400,000 as damages. Plaintiffs emphasize that Mr. and Mrs. Chopra provided the payment to the Hospital "to gain Dr. Chopra's admittance to the Residency Program." (*See* Dkt. # 65, Pg. ID 1629.) And Defendants are foreclosed from arguing to the contrary. (*See* Dkt. # 57.) The written Agreement requires the Hospital to provide a training program for the resident, Varun Chopra. (Dkt. # 1-3, Pg. ID 13.)  Plaintiffs have raised a genuine question of fact

as to whether the "parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract." *Schmalfeldt*, 670 N.W.2d at 654.

However, a finding of implied contract in fact and third-party beneficiary is not the only legal theory under which Varun Chopra could claim the $400,000 as damages. Plaintiffs allege that either Chopra's mother "gave him the funds" or "acting on her son's behalf, handed the checks to the Hospital's representative." (Dkt. #65, Pg. ID 1628.) Varun Chopra testified "[My parents] were in the [sic] sense my representatives from the financial transaction aspect." (Dkt. $61-1, Pg. ID 1347.) The court understands Plaintiffs' argument to be that Mrs. Chopra acted for her son with his knowledge and permission.

Defendants' understanding of the relationship at the time of contracting appears to have been likewise. *Alar*, 529 N.W.2d at 323 ("Apparent [agency] authority arises where the acts and appearances lead a third person reasonably to believe that an agency relationship exists.") The Hospital treated Mrs. Chopra's payment as fulfillment of Chopra's entry fee. If it had not considered the money to have been paid on Chopra's behalf as opposed to paid for another independent reason, the Hospital representative would not have signed the Residency Agreement because the agreement was to be signed only after Chopra made payment. (Dkt. # 57, Pg. ID 1247.) Even stronger evidence of Mrs. Chopra's authority to act on her son's behalf is that the Hospital contacted her directly regarding Chopra's departure from the program. Chopra was an adult man and a doctor at the time of the events, yet the Hospital's representative saw

fit to call his mother regarding his status in the program.

If Poonam Chopra was indeed acting as an agent on her son's behalf, then her payment to the Hospital could be attributed to him. *See Alken-Ziegler, Inc. v. Waterbury Headers Corp.*, 600 N.W.2d 638, 641 (Mich. 1999) ("A party is responsible for any action or inaction by the party or the party's agent.). The court agrees with Plaintiffs that the "attending facts and circumstances" raise a genuine question whether Poonam Chopra stood in an agency relationship to her son; therefore, the question is one for a jury. *See Douglas v. Ins. Co. of N. Am.*, 184 N.W. 539, 541 (Mich. 1921).

Additionally, Plaintiffs argue they are entitled to the return of their $400,000 because they did not receive the benefit promised in exchange for their money as Varun Chopra was not permitted to begin the residency program on November 1, 2016. (Dkt. # 65, Pg. ID 1629.) Defendants respond and argue that Varun Chopra did enter the residency program—he was given access to the online resident system, provided assistance in obtaining a visa, and participated in the Hospital's Observership Program. Even if the court were to assume the truth of Defendants' position, the record is not devoid of evidence showing that Defendants "retain[ed] money or benefits which in justice and equity belong to another." *PNC Bank*, 88 F. Supp. 3d at 784.

Moreover, the court concluded that "the 'donated' funds were in fact a mandatory component of the terms of the residency agreement (Dkt. # 57, Pg. ID 1245-46.) A "component" is a "part or element of a larger whole." (Oxford English Dictionary.) As a result, a genuine question of fact remains as to whether the $400,000 "arise[s] naturally from the breach" and/or was "in the contemplation of the parties at the time the contract

was made." *Kewin*, 295 N.W.2d at 52-53. Defendants have not shown that there is no evidence to present a genuine question of fact regarding whether Varun Chopra is entitled to claim the $400,000 at issue as damages.

### 3. Entry into the Residency Program

Defendants contend that they are entitled to summary judgment because there is no genuine dispute of fact as to whether Varun Chopra entered the Hospital's residency program. Because Varun Chopra entered the program, Defendants' argue, the Hospital did not breach its contract with him regardless of whether he withdrew or was terminated. As explained *supra* Section III.C, the court finds Varun Chopra's "entry" into the residency program to be a material fact that is genuinely in dispute.

Furthermore, the court is not convinced that mere entry into the residency program would have satisfied the Hospital's obligations under the contract. The court held that "the 'donated' funds were in fact a mandatory component of the terms of the residency agreement." (Dkt. # 57, Pg. ID 1245-46.) The terms of the Agreement state, "Hospital offers and Resident accepts appointment as a first year resident in Family Medicine *for the year*." (Dkt. # 1-3, Pg. ID 13.) (emphasis added) Plaintiff Varun Chopra did not serve as a resident for "the year." The court will deny Defendants' motion.

### 4. Termination under the Residency Agreement

Defendants argue that regardless of the disputed facts, they had the authority under the contract to terminate Varun Chopra. Specifically they cite the following provision from the Residency Agreement:

VII. TERMINATION

> Hospital may terminate this agreement or not renew this agreement in the event that the Hospital determines in its sole discretion that the Resident has failed to fulfill his/her obligations under this agreement.

Defendants ignore the unambiguous language of the provision. While it is true, the Hospital has the authority to terminate the agreement, it may do so "in the event it determines" that Varun Chopra "failed to fulfil [his] obligations" under the agreement. The Hospital has not conceded Plaintiffs' contention that Chopra was terminated, nor has it shown a determination by the Hospital that he "failed to fulfill" any of his obligations under the contract. The existence of a termination provision standing alone does not justify the breach that Plaintiffs allege. Defendants are not entitled to summary judgment on this basis.

## IV. CONCLUSION

Plaintiffs' proposed amended complaint is untimely and will be denied. While the arguments offered therein—purportedly intended to strengthen and clarify Plaintiffs' breach of contract claim—could aid the court's review of Plaintiffs' claim, they are not necessary to its survival of Defendants' Motion for Summary Judgment.

Both Plaintiffs' and Defendants' Motions for Summary Judgment rely on the alleged indisputability of a key fact—Varun Chopra's entrance into the Hospital's residency program. The court finds there is a genuine dispute regarding this material fact. Likewise, Defendants' additional arguments do not entitle them to summary judgment because there are genuine issues of material fact regarding Satish and Poonam Chopras' relationship with the Hospital as well as the damages suffered by Varun Chopra. Accordingly,

IT IS ORDERED that Plaintiffs' Motion to Leave to File an Amended Complaint (Dkt. # 77) is DENIED.

IT IS ORDERED that Defendants' Motion for Summary Judgment (Dkt. # 59) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (Dkt. # 61) is DENIED.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 23, 2018


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 23, 2018, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522